# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MEMBERS 1ST FEDERAL CREDIT | : | |
| UNION | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | CIVIL ACTION NO. 09-CV-01171 |
| | : | |
| METRO BANK AND | : | HONORABLE YVETTE KANE |
| METRO BANCORP, INC. | : | |
| | : | |
| Defendants. | : | |

## BRIEF OF DEFENDANTS METRO BANK AND
## METRO BANCORP, INC. IN SUPPORT OF
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Paul J. Kennedy (PA 39291)
Thomas E. Zemaitis (PA 23367)
J. Anthony Lovensheimer (PA 209822)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA   19103-2799
Phone:      (215) 981-4000
Fax:      (215) 981-4750
Email: kennedyp@pepperlaw.com
    zemaitist@pepperlaw.com
    lovensheimera@pepperlaw.com

Brian P. Downey (PA 59891)
Frederick Alcaro (PA 91555)
PEPPER HAMILTON LLP
Suite 200, 100 Market Street
P.O. Box 1181
Harrisburg, PA 17108-1181
Phone:      (717) 255-1155
Fax:      (717) 238-0575
Email: downeyb@pepperlaw.com
    alcarof@pepperlaw.com

*Attorneys for Defendants Metro
    Bank and Metro Bancorp, Inc.*

Dated:  July 19, 2010

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................1

II.  PROCEDURAL HISTORY ..................................................3

III. STATEMENT OF UNDISPUTED FACTS ........................3

    Metro Bank's Break From Commerce Bank ....................4

    The Genesis Of The Metro Bank Brand .........................6

    The Creation Of The Metro M Mark ..............................7

    Members 1st's Silence During Metro Bank's Rebranding ...............8

    Members 1st's Actual Damages .......................................9

IV.  QUESTIONS PRESENTED ..............................................11

V.   ARGUMENT .....................................................................12

  A.  Summary Judgment Standard .......................................12

  B.  There Is No Evidence Of Actual Damages. ..................13

  C.  Members 1st Is Not Entitled To Treble Damages
      Under 15 U.S.C. § 1117(a). ........................................15

      1.  Plaintiff Has No Evidence Of Actual Damages. ...................15

      2.  Any Alleged Infringement Was Not Willful. .....................16

  D.  Members 1st Is Not Entitled To Attorneys' Fees Under
      15 U.S.C. § 1117(a). ..................................................19

  E.  Members 1st Is Not Entitled To An Accounting Of Defendants'
      Profits ...........................................................................21

VI.  CONCLUSION ..................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Accu-Pers., Inc. v. Accustaff, Inc.*, 846 F. Supp. 1191 (D. Del. 1994) .............. 13, 16

*Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168 (3d Cir. 2005) ................................. 22

*Bishop v. Equinox Int'l Corp.*, 154 F.3d 1220 (10th Cir. 1998) .............................. 22

*Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*,
12 F.3d 1292 (3d Cir. 1993) .................................................................................... 12

*Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269 (3d Cir. 1975) .............. 15

*Callaway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735 (D. Del. 2005) ................... 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................... 12

*Cosi, Inc. v. WK Holdings, LLC*,
2007 U.S. Dist. LEXIS 31990 (D. Minn. May 1, 2007) .......................................... 13

*Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*,
952 F.2d 44 (3d Cir. 1991) .......................................................................... 19, 20, 21

*Green v. Fornario*, 486 F.3d 100 (3d Cir. 2007) ..................................................... 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .............. 12

*Mattel, Inc. v. Robarb's Inc.*, 139 F. Supp. 2d 487 (S.D.N.Y. 2001) ................ 13, 16

*Optimum Tech., Inc. v. Home Depot USA, Inc.*,
2005 U.S. Dist. LEXIS 34776 (N.D. Ga. Dec. 5, 2005) ..................................... 13, 16

*Securacomm Consulting, Inc. v. Securacom, Inc.*,
166 F.3d 182 (3d Cir. 1999) ....................................................................... 16, 17, 19

*Toro Co. v. Textron, Inc.*, 499 F. Supp. 241 (D. Del. 1980) ................................... 16

STATUTES

*15 U.S.C. § 1117* ...................................................................... 11, 15, 16, 19, 21

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c)..............................................................................................12

Fed. R. Civ. P. 56(e)..............................................................................................12

## I.    <u>INTRODUCTION</u>

This case involves Members 1st's claim that Metro Bank's federally-registered trademark **M**® (the "Metro M Mark") infringes Members 1st's federally registered trademark **M**st (the "M1st Mark").  However, this motion does not concern liability on the infringement claim; instead, the sole issue raised in this motion for partial summary judgment is whether, based on the undisputed facts, Members 1st's claims for monetary relief under the Lanham Act and common law must be dismissed as a matter of law.

As detailed below, Members 1st is not entitled to monetary damages under the Lanham Act or common law, treble damages under the Lanham Act, or an award of attorneys' fees under the Lanham Act because Members 1st cannot prove: (1) that it suffered <u>any</u> actual damages; (2) that Metro Bank willfully infringed the M1st Mark; or (3) that Metro Bank's conduct qualifies as the "culpable conduct" required for this to be an "exceptional" case under the Lanham Act.

First, Members 1st has produced no admissible evidence that it has suffered any actual damages resulting from Metro Bank's use of the Metro M Mark.  Instead, Members 1st relies on inadmissible conjecture to support its claims for actual damages.  With this dearth of evidence, Members 1st cannot support an

award of actual damages.  And, with no actual damages, treble damages are not available.

Second, the evidence establishes that Metro Bank adopted the Metro M Mark as part of a larger plan to continue its well-established Commerce Bank identity in a geographic region that includes, but also extends well beyond, the limited six-county region in South Central Pennsylvania in which Members 1st operates.  Metro Bank's adoption of the Metro M Mark was driven by several factors:  (1) the desire to link its new brand with its Commerce Bank heritage; (2) the need to adopt a new mark after the sale of Commerce Bank to TD Bank; (3) the plan to launch the new Metro Bank in the Philadelphia area after a then-planned merger with Philadelphia-based Republic First Bank; and (4) the plan to use the Metro Bank name and the Metro M Mark in conjunction with the launch of a new bank in the United Kingdom also called Metro Bank ("Metro Bank (UK)") by former Commerce Bank founder, Vernon Hill.

Finally, Metro Bank's conduct does not qualify as "culpable" as required for a case to be deemed "exceptional" under the Lanham Act.  The Metro M Mark was created by an outside firm, InterArch (the same company that developed the Commerce Bank branding and trade dress), on behalf of Mr. Hill for use in connection with Metro Bank (UK).  It was not created for use within the six-county area serviced by Members 1st.  Rather, the brand was ready-made, and

Metro Bank simply acquired the right to use it by entering a Co-Branding

Agreement with Metro Bank (UK).

These undisputed material facts establish that Metro Bank did not

attempt to take advantage of whatever goodwill existed with the M1st Mark when

it adopted the Metro M Mark in 2009.  Members 1st can adduce no facts that

would support a finding to the contrary.  Therefore, Metro Bank is entitled to

dismissal of Members 1st's claims for actual damages, treble damages and

attorneys' fees under the Lanham Act and dismissal of Members 1st's claim for an

accounting of profits under the Lanham Act or under common law.

## II.    PROCEDURAL HISTORY

On June 1, 2009, Members 1st filed a complaint with this Court.

[Doc. 1].  Discovery closed on May 17, 2010.  [Doc. 23].  The case is set for trial

on November 1, 2010.  [Doc. 23].

## III.    STATEMENT OF UNDISPUTED FACTS

Metro Bancorp, Inc. is a holding company that owns 100% of the

stock in Metro Bank, an operating company incorporated in Pennsylvania.  *See*

Statement of Undisputed Material Facts of Defendants Metro Bank and Metro

Bancorp, Inc. ("SOF") at ¶ 1, Exh. A (Gary Nalbandian Deposition ("Nalbandian

Dep.") 21:10-22:6).  Metro Bank is a full service financial services retailer that

provides personal and commercial banking services for consumers and small and

mid-sized companies.  SOF at ¶ 2, Exh. B (Answers and Objections of Defs.'
Metro Bank and Metro Bancorp, Inc. to Pl.'s First Set of Interrogs., Interrog.
No. 2).

Members 1st is a federally-chartered credit union organized under the
laws of the United States and headquartered in Mechanicsburg, Pennsylvania
17055.  *Id.* at ¶ 4.  Members 1st provides credit union and financial services
through branches located in Adams, Cumberland, Dauphin, Lebanon, Perry and
York Counties in Pennsylvania.  *Id.* at ¶ 5.

### Metro Bank's Break From Commerce Bank

Prior to becoming Metro Bank in 2009, Metro Bank was known as
Pennsylvania Commerce Bancorp and operated as "Commerce Bank" (referred to
herein as "Pennsylvania Commerce" during the relevant time period) pursuant to
an agreement with Commerce Bank New Jersey ("Commerce New Jersey").  *Id.* at
¶ 12, Exh. A (Nalbandian Dep. 27:14-29:2).  Under this agreement, Pennsylvania
Commerce operated essentially as a franchisee of Commerce New Jersey.  *Id.*

Pennsylvania Commerce was permitted to operate as Commerce Bank
and to utilize Commerce New Jersey's trademarks and trade dress until such time
as Commerce New Jersey ceased to operate under the Commerce brand.  *Id*. at ¶
14, Exh. A (Nalbandian Dep. 8:17-9:10, 27:14-29:2).  In such an event, the

agreement with Commerce New Jersey allowed Pennsylvania Commerce one year
to cease using the Commerce Bank name and to rebrand.  *Id.*

In August 2007, Toronto Dominion Bank ("TD Bank") announced its
purchase of Commerce New Jersey.  *Id.* at ¶ 15, Exh. A (Nalbandian Dep. at
27:14-28:3).  At that point, Metro Bank began to consider new names, consistent
with its contractual obligation to rebrand.  *Id.* at ¶ 16, Exh. A (Nalbandian Dep. at
27:6-30:10).  During the negotiations with TD Bank, it was unclear to what extent
Pennsylvania Commerce's new name and image would have to depart from the
Commerce Bank name, brand and accompanying trade dress.  *Id.* at ¶ 17, Exh. A
(Nalbandian Dep. at 7:14-7:25, 30:11-30:18).

In the Summer of 2008, a public relations and design company
developed several potential new "C" logos that would allow Pennsylvania
Commerce to retain the "C" identity associated with Commerce Bank.  *Id.* at ¶¶
17-8, Exh. A (Nalbandian Dep. at 29:21-31:14, 32:13-33:13, Plaintiff's Exhibit 2).
But, under the terms of the TD Bank Agreement dated December 31, 2008,
Pennsylvania Commerce was not permitted to retain the letter "C" in connection
with its rebranding.  *Id.* at ¶ 21, Exh. A (Nalbandian Dep. at 30:19-32:5).
Pennsylvania Commerce did retain the right to use the exact same shade of red that
it had used in the Commerce Bank logo.  *Id.* at ¶ 19, Exh. A (Nalbandian Dep. at
30:19-32:5).

## The Genesis Of The Metro Bank Brand

Ultimately, Pennsylvania Commerce adopted the name "Metro Bank" along with the Metro M Mark as part of a larger overall plan comprising a contemplated merger with the Philadelphia-based Republic First Bank and a co-branding agreement with Metro Bank (UK). *Id*. at ¶ 23, Exh. A (Nalbandian Dep. at 33:16-34:5).

In the Summer of 2008, Republic First and Pennsylvania Commerce engaged in discussions regarding the potential merger. *Id*. at ¶ 26, Exh. A (Nalbandian Dep. at 35:9-36:2). On November 10, 2008, the parties issued a press release that announced their intention to merge and to adopt the new name Metro Bank. *Id.* at ¶ 38, Exh. C (Defendants' Exhibit 12 attached to Robert Marquette Deposition ("Marquette Dep.")). The press release included the new Metro Bank name and the Metro M Mark. *Id*.

Under the original plan, which was predicated on regulatory approval of the proposed merger, Republic First would rebrand as "Metro Bank" during the second quarter of 2009 and commence using the Metro Bank name along with the Metro M Mark at its locations throughout Philadelphia and New Jersey. *Id*. at ¶ 27, Exh. A (Nalbandian Dep. at 37:12-39:13; *see also* Exh. E. Pennsylvania Commerce would have then rebranded during the third quarter of 2009. *Id*.

The original rebranding plan could not be followed because the proposed merger was not approved prior to Pennsylvania Commerce's contractual deadline to rebrand. *Id*. at ¶ 28, Exh. A (Nalbandian Dep. at 38:20-39:13).

### The Creation Of The Metro M Mark

At the time that Pennsylvania Commerce began negotiating the potential merger and the co-branding agreement, the Metro M Mark and the Metro Bank name had already been created for Metro Bank (UK) by the advertising and design architectural firm called InterArch. *Id*. at ¶ 30, Exh. A (Nalbandian Dep. at 40:3-41:12; *see also* Exh. F. InterArch was the same company that had created and designed the Commerce Bank branding, including the Commerce "C" logo. *Id.* at ¶ 31.

On May 26, 2009, Pennsylvania Commerce and Metro Bank (UK) entered into an agreement to share the development costs and ultimately divide the ownership of all intellectual property developed in connection with the branding of Metro Banks in the United States and United Kingdom (the "Co-Branding Agreement"). *Id*. at ¶ 32, Exh. A (Nalbandian Dep. at 93:11-93:18; *see also* Exh. G.

By the time that Pennsylvania Commerce entered into the Co-Branding Agreement with Metro Bank (UK), InterArch had already completed the creation of the Metro Bank brand designs, including the Metro M Mark. *Id*. at ¶

34, Exh. A (Nalbandian Dep. at 99:15-100:3).  All of the Metro Bank branding was provided exclusively by InterArch.  *Id*. at ¶ 36, Exh. A (Nalbandian Dep. at 98:24-99:14).

### Members 1st's Silence During Metro Bank's Rebranding

Robert Marquette, the President and CEO of Members 1st, testified that he became aware of Pennsylvania Commerce's new Metro Bank name as early as November 10, 2008 when he saw the press release concerning the intended merger with Republic First.  *Id.* at ¶ 37, Exh. C (Marquette Dep. at 123:1-123:21, Defendants' Exhibit 12).  In the same time frame, late 2008 through early 2009, Mr. Marquette became aware of the Metro M Mark.  *Id.* at ¶ 39, Exh. C (Marquette Dep. at 123:22-124:1).  Mr. Marquette's reaction to the Metro M Mark was that it was similar to M1st Mark.  *Id*. at ¶ 40, Exh. C (Marquette Dep. at 124:2-125:3).  In the first half of 2009, Mr. Marquette also saw a promotional flyer announcing the name change from Commerce Bank to Metro Bank.  *Id*. at ¶ 42, Exh. C (Marquette Dep. at 125:8-126:12).

Notwithstanding this knowledge, Members 1st did not contact Metro Bank at that time regarding the Metro M Mark.  *Id*. at ¶ 41, Exh. C (Marquette Dep. at 125:4-125:7).

Mr. Marquette also testified that in April 2009 he became aware that the minor league baseball stadium in Harrisburg, Pennsylvania, which was

previously called Commerce Bank Park, would be renamed Metro Bank Park.  *Id*.
at ¶ 43, Exh. C (Marquette Dep. at 126:13-126:24).  After the name change to
Metro Bank Park, which also incorporated the Metro M Mark, Members 1st did
not contact Metro Bank.  *Id*. at ¶ 44, Exh. C (Marquette Dep. at 126:25-127:14).

      Prior to initiating this lawsuit, Members 1st never sent a cease and
desist letter to Metro Bank, nor did Members 1st contact Metro Bank by telephone
to express concern regarding Metro Bank's use of the Metro M Mark.  *Id*. at ¶ 45,
Exh. C (Marquette Dep. at 127:15-127:25, 128:8-128:19).  Members 1st also did
not seek a temporary restraining order or a preliminary injunction against use of
the Metro M Mark.  *Id*. at ¶ 46, Exh. C (Marquette Dep. at 128:1-128:7).

## Members 1st's Actual Damages

      According to Mr. Marquette, Members 1st's claim for damages
consists of purported losses stemming from the opening of accounts with Metro
Bank instead of Members 1st by individuals who were confused between the M1st
Mark and the Metro M Mark.  *Id*. at ¶ 49, Exh. C (Marquette Dep. at 134:4-
134:10).  Members 1st purports to rely on "an email or two" relaying anecdotal
stories about customers who had received promotional materials from Members 1st
that were taken to Metro Bank and honored by Metro Bank.  *Id*. at ¶ 50, Exh. C
(Marquette Dep. at 134:11-135:1).  Members 1st has not identified any of these

individual(s) who were allegedly confused, nor has Members 1st identified the "email or two" to which Mr. Marquette referred.

Mr. Marquette also testified that Members 1st suffered damages as a result of "some situations where people came into our facilities looking to conduct business transactions when they were actually Metro Bank customers, which took our resources to explain to them that we are not Metro Bank." *Id*. at ¶ 53, Exh. C (Marquette Dep. at 135:7-135:20). This vague suggestion is not supported by any evidence, and Members 1st has made no effort to quantify this purported loss. Mr. Marquette ultimately testified that he could not quantify any of the alleged damages Members 1st has incurred due to Metro Bank's use of the Metro M Mark. *Id*. at ¶ 48, Exh. C (Marquette Dep. at 133:23-134:3).

Members 1st responded to Metro Bank's Interrogatory concerning damages: "Members 1st's [sic] directs defendants to the documents produced in response to defendants' first set of requests for production of documents, which include evidence of actual confusion and damages that Members 1st suffered as a result. *Id.* at ¶ 55, Exh. H (Pl.'s Answers and Objections to Defs.' Interrogs., Interrog. No. 12). By way of further answer, Members 1st's investigation into its monetary damages continues." *Id.* However, Members 1st's document production did not contain any evidence of Members 1st's actual damages. Plaintiff never

supplemented this response before the discovery period ended on May 17, 2010. [Doc. 23].

## IV.   <u>QUESTIONS PRESENTED</u>

1.      Whether Members 1st's claim for actual damages under Section 35 of the Lanham Act must be dismissed because the record contains no evidence of actual damages?

Suggested Answer: Yes.

2.      Whether Members 1st's claim for treble damages under Section 35 of the Lanham Act must be dismissed both because Members 1st has suffered no actual damages and because Members 1st has no evidence to establish that Metro Bank willfully infringed the Members 1st Mark?

Suggested Answer: Yes.

3.      Whether Members 1st's claim for attorneys' fees under Section 35 of the Lanham Act must be dismissed because Members 1st has presented no evidence to establish the "culpable conduct" necessary to support a finding that this case is an "exceptional" case under Section 35 of the Lanham Act?

Suggested Answer: Yes.

4.      Whether Members 1st's claim for an accounting of Metro Bank's profits under the Lanham Act and under common law must be dismissed

because Members 1st has no evidence to establish that Metro Bank's alleged

infringement of Members 1st's Logo was either willful or in bad faith?

       Suggested Answer: Yes.

## V.    <u>ARGUMENT</u>

### A.    <u>Summary Judgment Standard</u>

       Rule 56 of the Federal Rules of Civil Procedure provides that a

moving party is entitled to summary judgment when the record demonstrates that

"there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v.

Catrett*, 477 U.S. 317, 325 (1986). If the non-movant fails to produce evidence of

an essential element for which it has the burden of proof, the movant is entitled to

summary judgment as a matter of law. *Celotex*, 477 U.S. at 323; *Bixler v. Cent.

Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1302 (3d Cir. 1993).

       Similarly, if the movant does not shoulder the burden of proof, its

burden is "discharged by 'showing' – that is, pointing out to the district court –

that there is an absence of evidence to support the [plaintiff's] case." *Celotex*, 477

U.S. at 325. When responding to such a motion for summary judgment, the non-

moving party must demonstrate that there are "specific facts showing that there is a

genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).

Summary judgment as to damages is appropriate in a trademark infringement case where, as here, there is no genuine issue of material fact that no damages have been shown, that the defendant's alleged infringement was not willful, and that the defendant's conduct does not constitute "culpable conduct" under the Lanham Act.  *See e.g. Cosi, Inc. v. WK Holdings*, *LLC*, No. 05-2770, 2007 U.S. Dist. LEXIS 31990, at *8-10 (D. Minn. May 1, 2007)[1]; *Optimum Tech., Inc. v. Home Depot USA, Inc*., No. 1:04-CV-3260, 2005 U.S. Dist. LEXIS 34776, at *11-3 (N.D. Ga. Dec. 5, 2005), *aff'd*, 217 Fed. Appx. 899 (11th Cir. 2007); *Mattel, Inc. v. Robarb's Inc.,* 139 F. Supp. 2d 487, 493-5 (S.D.N.Y. 2001); *Accu-Pers., Inc. v. Accustaff, Inc.*, 846 F. Supp. 1191, 68 (D. Del. 1994).

### B.     There Is No Evidence Of Actual Damages.

Members 1st has produced no admissible evidence to establish either the existence or measurement of its actual damages resulting from Metro Bank's use of the Metro M Mark.  Members 1st's sole evidence consists of vague assertions by its President and CEO, without any documentary support, alleging that Members 1st has suffered monetary damages resulting from: (1) individuals opening accounts with Metro Bank instead of Members 1st due to their confusion between the M1st Mark and the Metro M Mark; (2) potential customers taking

---

[1] Pursuant to Rule 7.8 of the Local Rules of the U.S. District Court for the Middle District of Pennsylvania, copies of all unpublished opinions cited herein

(continued...)

Members 1st promotional materials to Metro Bank where they were honored by

Metro Bank; and (3) Metro Bank customers mistakenly entering Members 1st

facilities looking to conduct business transactions.  SOF at ¶¶ 49-53, Exh. C

(Marquette Dep. at 134:4-135:20).  With no evidence to support its claims,

Members 1st's claim for damages is based on conjecture and cannot be submitted

to a jury.

Members 1st has not identified any of the individual(s) who were

allegedly confused and opened an account with Metro Bank, nor has Members 1st

specifically identified the "email or two" to which Mr. Marquette referred.  *Id*. at ¶

50, Exh. C (Marquette Dep. at 134:11-135:1).[2]  Moreover, even if this vague

hearsay were accepted as evidence probative of lost potential customers,

Mr. Marquette testified that Members 1st could not quantify the alleged damages

Members 1st has incurred.  *Id*. at ¶ 48, Exh. C (Marquette Dep. at 133:23-134:3).

_____

(continued...)

are attached hereto as Exhibit 1.

[2] The only e-mail in Members 1st's document production is of no support as
it is rife with hearsay and, therefore, not admissible evidence.  The e-mail includes
the following statement:  "Lisa Spaulding, one of my tellers, just told me that when
she interviewed with Kim Ryan at Mt. Rose Kim told her a story about a new
member who had a SEG coupon for $25 for direct deposit and took it into Metro
when they saw the "M".  Lisa said that Kim told her that the member reported that
Metro offered to honor the $25 and match our offer if they opened the account at
Metro and did not bring the coupon to Members 1st."  *See* SOF at ¶ 50, Exh. C
(Marquette Dep. at 134:11-135:1).

That this lack of evidence of actual damages compels dismissal of Members 1st's claim is even more certain given that Metro Bank's use of the Metro M Mark has been ongoing and continuous since June 2009.  Yet, despite Metro Bank's continuous use, Members 1st still has not produced any admissible evidence of resulting damages.  In addition, Members 1st's own inaction reveals that even it recognized it has suffered no actual damage.  Had Members 1st believed it stood to suffer damages, it would have sent a cease and desist letter or sought preliminary injunctive relief.  But Members 1st did none of that; indeed, it did not even attempt to contact Metro Bank prior to filing this lawsuit.

With no evidentiary basis for its actual damages claims, Members 1st's claims for actual damages under the 15 U.S.C. §1117(a) and under common law must be dismissed.

**C.    Members 1st Is Not Entitled To Treble Damages Under 15 U.S.C. § 1117(a).**

Defendants are entitled to summary judgment on Members 1st's claim for treble damages under 15 U.S.C. § 1117(a) because: (1) Members 1st cannot establish any actual damages and (2) the undisputed facts establish that any alleged infringement of the M1st Mark was not willful.

**1.    Plaintiff Has No Evidence Of Actual Damages.**

The Third Circuit has held that there cannot be any trebling of the award of damages where no actual damages are proven.  *Caesars World, Inc. v.*

*Venus Lounge, Inc.*, 520 F.2d 269, 274 (3d Cir. 1975) (trebling is inappropriate where no actual damages proved because "[t]hree times zero is zero"); *see also Toro Co. v. Textron, Inc.*, 499 F. Supp. 241, 255 (D. Del. 1980).  Thus, a claim for treble damages is appropriately dismissed on a motion for summary judgment where the plaintiff has failed to show any actual damages.  *Accu-Pers., Inc.*, 846 F. Supp. at 68; *see also Optimum Tech., Inc.*, 2005 U.S. Dist. LEXIS 34776, at *12-3 (holding that plaintiff with no actual damages is not entitled to enhanced damages).

### 2.    Any Alleged Infringement Was Not Willful.

Treble damages are typically awarded pursuant to 15 U.S.C. § 1117 when the infringement is shown to be willful.  *Mattel, Inc.,* 139 F. Supp. 2d at 493-5.  A claim for an award of treble damages may be dismissed on a defendant's summary judgment motion where a plaintiff has failed to raise a genuine issue of material fact as to a defendant's willful infringement.  *Id.*  Members 1st simply cannot make such a showing.  Indeed, the undisputed record establishes that Metro Bank's adoption of the Metro M Mark had nothing to do with a willful attempt to usurp any goodwill that may have been associated with the M1st Mark.

The Third Circuit has established that "willful infringement consists of more than the accidental encroachment of another's rights."  *Securacomm Consulting, Inc. v. Securacom, Inc.*, 166 F.3d 182, 187 (3d Cir. 1999).  Willful trademark infringement occurs where the infringer shows indifference to the

intellectual property rights of the trademark owner and attempts to steal the goodwill associated with the trademark.  *Id.*

Metro Bank's adoption of the Metro M Mark had nothing to do with an attempt "to steal the goodwill associated with the [M1st Mark]."  To the contrary, Metro Bank adopted the Metro M Mark after InterArch had already independently developed the Metro Bank branding, including the Metro M Mark, for use by Metro Bank (UK) in the United Kingdom.  *See* SOF at ¶ 30, Exh. A (Nalbandian Dep. at 40:3-41:12).  Metro Bank played no role in the actual development of the Metro M Mark.  In fact, InterArch never presented Metro Bank with any alternate logos or designs.  *Id.* at ¶ 35, Exh. A (Nalbandian Dep. at 41:14-41:23).  The Metro Bank brand was ready-made, and Metro Bank simply adopted the brand as reflected by ultimately entering the Co-Branding Agreement with Metro Bank (UK).  *Id.* at ¶ 32, Exh. A (Nalbandian Dep. at 93:11-93:18; *see also* Exh. G.

InterArch had designed and created all of the Commerce Bank branding, including the Commerce "C".  The Metro M Mark that InterArch created for the founder of Commerce Bank, Vernon Hill, to use in his new Metro Bank (UK) venture reflected many of the same elements as the Commerce "C".  The Metro M Mark uses the exact same shade of red that was previously used for the Commerce "C" Mark.  Not only does the red color evoke the Commerce heritage,

the break in the Metro M Mark also echoes the break in the Commerce "C".  *See*

SOF at ¶¶ 19-20, Exh. A (Nalbandian Dep. at 30:19-32:5, 48:16-49:4).

Given that Metro Bank's rebranding was little more than a transition

of the name, since it would operate with all the same locations, employees,

services, and customers, Metro Bank's adoption of the Metro M Mark that

InterArch had developed was intended to evoke the look and feel of its prior

Commerce "C" Mark."  *Id.*  In fact, the ability to maintain this direct link to its

Commerce heritage was one of the key rights that Metro Bank negotiated to

maintain pursuant to the terms of the TD Bank Agreement.  *Id.*  Metro Bank made

the direct link to its Commerce heritage abundantly clear to consumers and

investors alike through explicit references both in advertisements and in the

Annual Report that were published around the time of the Metro Bank rebranding

in June 2009.  *See* SOF at ¶¶ 38, 42, Exh. C (Marquette Dep. at Defendants' Exhs.

12 & 13).  The goodwill which Metro Bank sought to maintain was that of

Commerce Bank, not Members 1st.

At no point did Metro Bank, or any of the parties involved in either

the merger or the Co-Branding Agreement, consider adopting the Metro M Mark

as an attempt to capitalize on any goodwill that Members 1st may have developed

in the M1st Mark within its limited six-county region since first adopting the M1st

Mark in 2005.  Metro Bank's rebranding, including the adoption and use of the

Metro M Mark, was a part of a larger plan to merge with Republic First Bank and

eventually launch a new bank with branches extending from South Central

Pennsylvania through the Greater Philadelphia Area.  *See* SOF at ¶ 23, Exh. A

(Nalbandian Dep. at 33:16-34:5).  Instead, when the merger failed, Metro Bank's

plans for the new Metro Bank brand, including the Metro M Mark, were refocused

on establishing a new brand identity in the same basic geographic footprint that it

already occupied while using the Commerce brand, including the Commerce "C"

and the red color, and expanding from there.

Because there is no evidence that Metro Bank's adoption and use of

the Metro M Mark constitute willful infringement, Members 1st's claim for treble

damages under Section 35 of the Lanham Act must be dismissed.

### D.   Members 1st Is Not Entitled To Attorneys' Fees Under 15 U.S.C. § 1117(a).

The Lanham Act provides that courts "in exceptional cases may award

reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  As the use

of the word "exceptional" implies, this is not a simple fee-shifting provision by

which a prevailing plaintiff automatically recovers its fees.  To the contrary, the

Third Circuit has held that an exceptional case must involve some type of culpable

conduct on the defendant's part, such as bad faith, fraud, malice or knowing

infringement.  *Securacomm*, 224 F.3d at 280; *Ferrero U.S.A., Inc. v. Ozak Trading,*

*Inc.*, 952 F.2d 44, 47 (3d Cir. 1991).  Members 1st cannot establish any basis for finding culpable conduct in this case.

"[D]etermining whether a case is exceptional is a two-step process." *Green v. Fornario*, 486 F.3d 100, 103 (3d Cir. 2007).  The first requires a showing based on clear and convincing evidence that the losing party engaged in culpable conduct.  *Ferrero*, 952 F.2d at 47;[3] *see also Callaway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735, 747 (D. Del. 2005).  Absent this showing, the exceptionality inquiry ends.

First, for the reasons discussed above, Members 1st can point to no evidence – let alone the requisite clear and convincing evidence – that Metro Bank willfully infringed the M1st Mark or that Metro Bank has engaged in any fraudulent or malicious conduct.

Second, Members 1st has not produced the clear and convincing evidence required to establish a bad faith attempt to promote confusion between two similar trademarks.  *Ferrero U.S.A., Inc.*, 952 F.2d at 47.  Indeed, in cases such as this, where the alleged prevailing party does not provide any evidence that

_____

[3] Second, if the Court finds culpable conduct, it must decide whether the circumstances are "exceptional" enough to warrant a fee award.  *Green*, 486 F.3d at 103 ("a district court may not award fees without a finding of culpable conduct, but it may decline to award them despite a finding of culpable conduct based on the totality of the circumstances.").

the losing party intended to trade on the goodwill of the prevailing party's

trademark, a finding of bad faith is inappropriate. *Id.*

Finally, the claim for attorneys' fees must be dismissed because

Members 1st cannot establish or prove any actual damages in this case, which is

another factor courts consider in determining whether to award attorneys' fees.

*Ferrero*, 952 F.2d at 47. Since Members 1st fails to show any actual damages,

Plaintiff's claims for attorneys' fees likewise must fall. *Id.* at 49.

### E.   Members 1st Is Not Entitled To An Accounting Of Defendants' Profits.

Members 1st's claim for an accounting fails because it has not

adduced any evidence to show that Defendants profited from the use of the Metro

M Mark, let alone the amount of those profits. Nor is such a demonstration

feasible, given that this is not a case where the alleged infringer sold a product

bearing an infringing mark, where the link between the profits on sales and the

infringement can be shown.

In evaluating whether equity supports disgorging the infringer's

profits under 15 U.S.C. § 1117(a), courts consider factors such as "(1) whether the

defendant had the intent to confuse or deceive, (2) whether sales have been

diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the

plaintiff in asserting his rights, (5) the public interest in making the misconduct

unprofitable, and (6) whether it is a case of palming off." *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir. 2005).[4]

None of these factors is present here.  As discussed above, Members 1st has failed to establish the evidence necessary to support a finding of willfulness or bad faith by Metro Bank.  Members 1st has no evidence that Metro Bank intended to confuse or deceive consumers.  Members 1st has no evidence that Metro Bank has diverted any sales or profits from Members 1st.  Members 1st made no attempt to assert its rights against Metro Bank until well after Metro Bank commenced using the new Metro M Mark.  Therefore, Members 1st is not entitled to a disgorgement of profits, even if such profits could be shown.

---

[4] Members 1st's claim for an award of Metro Bank's profits also fails because Members 1st has not produced any evidence to establish actual damages. *See e.g. Bishop v. Equinox Int'l Corp.*, 154 F.3d 1220, 1223 (10th Cir. 1998) ("we recognize that a finding of actual damage remains an important factor in determining whether an award of profits is appropriate").

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, Members 1st's claims for damages, for treble damages, for attorneys' fees and for an accounting of Metro Bank's profits must all be dismissed.

Respectfully submitted,

Date: July 19, 2010

/s/ J. Anthony Lovensheimer
Paul J. Kennedy (PA 39291)
Thomas E. Zemaitis (PA 23367)
J. Anthony Lovensheimer (PA 209822)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA   19103-2799
Phone:        (215) 981-4000
Fax:   (215) 981-4750
Email:  kennedyp@pepperlaw.com
            zemaitis@pepperlaw.com
            lovensheimera@pepperlaw.com


Brian P. Downey (PA 59891)
Frederick Alcaro (PA 91555)
PEPPER HAMILTON LLP
Suite 200, 100 Market Street
P.O. Box 1181
Harrisburg, PA 17108-1181
Phone:        (717) 255-1155
Fax:   (717) 238-0575
Email:  downeyb@pepperlaw.com
            alcarof@pepperlaw.com

*Attorneys for Defendants Metro Bank
and Metro Bancorp, Inc.*

## <u>CERTIFICATE OF WORD COUNT</u>

I hereby certify that the word count of the foregoing brief, excluding tables and the certificates, as determined by the Microsoft Word software with which it was produced, is 4,782 words.

/s/ J. Anthony Lovensheimer
J. ANTHONY LOVENSHEIMER

## <u>CERTIFICATE OF SERVICE</u>

I, J. Anthony Lovensheimer, hereby certify that a true and correct copy of the foregoing Brief of Defendants Metro Bank and Metro Bancorp, Inc. in Support of Defendants' Motion For Partial Summary Judgment has been filed electronically and is available for viewing and downloading from the ECF system. All parties have consented to electronic service.

Date:  July 19, 2010                    /s/ J. Anthony Lovensheimer
                                        J. ANTHONY LOVENSHEIMER